THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MATTHEW HOLMES, Defendant-Appellant.

(Nos. 54515, 55701 cons.;

First District—June 9, 1972.

Gerald W. Getty, Public Defender, of Chicago, (Harold A. Cowen, Ronald P. Katz, and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Larry S. Boress, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

This is an appeal of a conviction for armed robbery. (Ill. Rev. Stat. 1967, ch. 38, par. 18—2.) Defendant was found guilty by a jury and was sentenced to four to 12 years. Defendant contends that (1) the pre-trial confrontation between the defendant and the complaining witness was so unfair that the defendant was denied due process of law; (2) he was not proven guilty beyond a reasonable doubt; and (3) the court erred in failing to state findings of fact and conclusions of law when it denied defendant's motion to suppress the identification.

On October 19, 1968, at about one o'clock in the morning, Samuel Finley arrived at the Zodiac Lounge, a neighborhood tavern at the corner of Homan and Carroll. The outside of the lounge is illuminated by a street light which is six to eight feet from the entrance. There is a neon sign in the window of the lounge which shines out into the street. Upon entering the lounge one must go through two doors. The inside is lighted by ceiling fixtures with three or four bulbs in each fixture. Although dim, the light is sufficient to see across the room (over 20 feet).

After entering the Zodiac Lounge, Finley saw defendant and two other men standing in front of him in an aisle; defendant was four to five feet from him.

Rufus White, a friend of Finley, was also in the lounge and testified he saw Finley and the defendant there at about one o'clock.

The defendant and two other men left the lounge about 1:30 A.M. Finley left immediately after them. As he stepped out of the outer door three men blocked his way. He was then struck on the right side of the head. He took out his knife and turned to the right to face his attacker. He found himself face to face (12 to 15 inches away) with the defendant who had a pistol. When the defendant saw Finley's knife, he told his two companions to "grab him." The three men disarmed him and then dragged him to an alley. The defendant then repeatedly struck Finley in the face with the pistol while his two companions held him and ordered the other two assailants to rip off Finley's clothes, which they did. Someone ordered Finley to jump over a nearby fence—which he did.

When Finley heard the men running away, he jumped back over the fence, put on what was left of his clothes and returned to the tavern. He then went to Franklin Boulevard Hospital for treatment where he reported the incident to a police officer. Twenty-five dollars, a watch and a pair of shoes were taken from him during the robbery.

The defendant's brother Edward testified that he was at home all night after ten o'clock on the night of the robbery. His brother Eugene came home about a quarter to one and then the defendant came in about one. His mother came in shortly after the defendant. The defendant had been drinking. He and the defendant talked and watched television for a while and then defendant fell asleep. When Edward went to sleep about three, the defendant was still sleeping.

The defendant's mother testified that on the night in question she arrived home at one o'clock in the morning and the defendant opened the door for her. The defendant then went to bed and had not left there when she went to bed about three o'clock.

The defendant's brother Eugene testified that he arrived home "[j]ust a little after 12:00." The defendant was at home when he arrived. His mother got home about one and the defendant let her in.

The defendant stated that at midnight he was in Elsie's Lounge on Lake and Homan (three or four blocks from his home). He was with Robert Mitchell at the time. He left the lounge about 12:30 and arrived home 10 minutes later. He talked to Mitchell for 10 or 15 minutes on his doorstep and then went upstairs to the apartment. When he entered the apartment, only Edward was home. He went into the bedroom he and Edward shared. In a short time Eugene came in. The defendant let his mother in about 1:00 or 1:15 and then returned to bed and fell asleep.

Rufus White, Jr., testified in rebuttal that he saw the defendant in the Zodiac Lounge on the night in question. The defendant left the lounge between 1:00 and 1:10 with two other people. He had seen the defendant 50 or 60 times prior to that evening. He has known Finley for several years.

On October 22, 1968, while riding in a car with Rufus White, Finley saw the defendant standing on the side walk at the corner of Lake and Kedzie. He told White, "[T]here's one of the guys that stuck me up, he was the main one. And he [White] asked me was I sure. I told him I was positive."

Finley and White went to the Zodiac Lounge. Three or four minutes after they arrived three plainclothes policemen entered the lounge, looked around and walked out. Finley followed them out. He told them he had been robbed the previous Friday night and he had just seen one of the holdup men. Finley described the robber as "six feet, weighed about a hundred and ninety or two hundred and ten, somewhere between there; had on a black leather jacket. He had a Van Dyke, which is a beard, and he was wearing a natural." The officers left to search for the robber and Finley went home.

About 20 or 25 minutes later Officer Horne came to Finley's home and led Finley to a nearby police car. The defendant and another man of similar size were in the back seat. Finley "looked in it and * * * recognized 'Caveman,'" indicating the defendant. He had heard after the robbery that a fellow named "Caveman" had been bragging that he and Billy Rice had robbed someone near the Zodiac Friday night. He was then asked if he knew the defendant by that name and he replied, "I didn't know him at all until I learned the name. I didn't even know he was the person that the name fit."

The defendant was wearing grayish blue pants, a black leather jacket and a light blue shirt. He is five feet eleven inches tall, weighs about 190 pounds, and wears his hair in a natural. (Defendant, the other man in the back seat and Finley are black.)

Defendant contends that the confrontation between himself and Finley was so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny due process of law; and that the in-court identification based on such a confrontation is inadmissible.

■■ The pre-trial confrontation in the case at bar may have been unnecessarily suggestive, but "if it is shown, by clear and convincing evidence, that the court room identification had an independent origin, arising from an earlier uninfluenced observation of the defendant," then an in-court identification is still admissible. *People v. Cook*, 113 Ill.App.2d 231, 236, 252 N.E.2d 29, 32.

■■ Finley had seen the defendant shortly before the attack at a distance of four or five feet in lighting sufficient to see across the room. At the onset of the attack he saw the defendant's face only 12 or 15 inches away in an area lighted by a nearby street light and a neon sign and continued to observe the defendant during the robbery and beating.

The record in the case at bar provides clear and convincing evidence of an independent origin for the in-court identification and therefore the in-court identification was admissible.

■■ The defendant also contends that he was not proven guilty beyond a reasonable doubt because of the persuasiveness of his alibi defense and Finley's lack of opportunity to observe the robbers. In answering a similar contention we stated the following in *People v. Cook, supra,* at page 241:

"It is true that where a conviction rests upon an identification which is doubtful, vague, and uncertain, it will be reversed. [Citations omitted.] This is ultimately a question for the trier of fact, however, whose duty it is to consider contradictory testimony, and to determine the credibility of the witnesses, and the weight to be given their evidence. [Citations omitted.]"

In the case at bar we find that there was sufficient identification evidence to establish defendant's guilt beyond a reasonable doubt.

■■■ Any reasonable doubt created by the defendant's alibi defense depends on the weight given to the contradictory evidence of the defendant and the State. This, also, is a question for the trier of fact, and the jury did not believe the defense witnesses in this case. We find no basis in the record to disturb the jury's conclusion.

■■ Defendant's final contention is that the court erred in failing to state findings of fact and conclusions of law when it denied defendant's motion to suppress Finley's pre-trial identification of the defendant. Defendant bases his argument on Ill. Rev. Stat. 1967, ch. 38, par. 114—12, Motion to Suppress Evidence Illegally Seized:

"(e) The order or judgment granting or denying the motion shall state the findings of fact and conclusions of law upon which the order or judgment is based."

Defendant admits in his brief that Paragraph 114—12 does not apply to suppressing an identification but he urges Paragraph 14—12 is a "sister motion" and shows a legislative intent to require findings of fact and conclusions of law.

■■ We find no merit in defendant's argument. The motion to suppress an identification is a creature of constitutional case law—it has no statutory basis in Illinois.

■■ We therefore find that the court was not required to state findings of fact or conclusions of law with respect to defendant's motion to suppress the identification.

For the foregoing reasons the judgment is affirmed.

Judgment affirmed.

LORENZ, P. J., and ENGLISH, J., concur.